Nat H. Hehtel, J.
This is an action for return of down payment deposit and for cost of materials supplied by virtue of defendant’s failure to deliver a specifically ordered custom-built sofa bed, properly crafted, within the time required as subsequently extended by the plaintiff. Defendant counterclaims for the balance due" on the specified sofa bed on the theory that plaintiff breached the contract of sale in failing to accept delivery and pay the balance, and because the item is not otherwise readily saleable inasmuch as it was specially built according to plaintiff’s distinctive specifications.
The facts of the case as revealed in tins nonjury trial are as follows: On October 1, 1971, plaintiff received two quotations in the form of memoranda orders in person from defendant’s salesman, Mr. Donato Bendinelli, concerning a proposed sale order for a “ Chesterfield ¡Style ” sofa bed. On October 11, 1971, plaintiff received from Mr. Bendinelli a memorandum sales order, in the presence of her professional decorator, for a “ BRA Style” roll-out sofa bed with “ Chesterfield Front Board and Nail Heads.” When asked what “BRA” stands for by plaintiff and her decorator, Mr. Bendinelli is reported to have replied: “ BRA means barrel rolled arms ” and “ don’t worry, you’re getting a Chesterfield’s sofa bed,”
According to pictures introduced into evidence by defendant, the Chesterfield piece has barrel rolled arms and decorative nailheads on the front of the arms, and has a one-piece seat cushion; whereas the “BRA” piece shows barrel rolled arms but no decorative nailheads in the front, and has three separate removable seat cushions, and three separate removable back cushions.
At the time of the order, plaintiff paid to defendant $250 on account, and she was also required to purchase the leather covering for the sofa bed from a supplier recommended by defendant, which she did, and she paid the supplier $308.35. Thus, before delivery of the sofa bed, which was first promised for Thanksgiving, 1971, and then later for Christmas, 1971, by Mr. Bendinelli, plaintiff was required to invest on account of the purchase $558.35, as of November 16, 1971, the date of *573 the leather purchase. The leather was ordered by plaintiff on October 18, 1971.
Plaintiff’s testimony that she needed the sofa by Thanksgiving, and then later by Christmas, is uncontroverted by defendant’s only witness, Mr. Bendinelli; and thus a “ time-is-of-the-essence ” factor enters into the purchase order made by plaintiff. Plaintiff states that Mr. Bendinelli told her: “We will try to deliver by Thanksgiving; we only need three working days after we get the leather from the supplier; and if we can’t do it by Thanksgiving — it will be definitely delivered before Christmas time.”
On December 16, 1971, not having as yet received the sofa bed, plaintiff obtained a bank check for the balance due defendant in the sum of $498.40 (the exact amount of the defendant’s counterclaim for the alleged breach of the sales contract by plaintiff) and offered to pay it to defendant by going to its showroom in person. She did not turn the check over, however, when she was informed that the sofa was still not ready.
Finally, after many calls back and forth involving inconvenience to the plaintiff, the piece was delivered to plaintiff’s residence on February 26, 1972. When it was unwrapped by the truckmen, and inspected by the plaintiff, she refused to accept it and sent it back to the defendant because she discovered ‘ ‘ the bed part was falling out of the bottom; the leather covering was loose in the back; the seams were uneven; the leather upholstery buttons were not anchored; there were no decorative Chesterfield nail heads in the back; the cushion was very hard and not soft to sit on like the showroom model; and the back had a poor sitting angle.”
Thereafter, and early in March, 1972, plaintiff went to defendant’s showroom at the invitation of a Mr. Di Mateo, one of the defendant’s owners, and was there told by defendant’s employee, Mr. Jack Hayes, who took all the complaints of the plaintiff down, that the sofa bed would be repaired in about two weeks time. The sofa not being ready in the time specified, plaintiff made a complaint against defendant to the New York City Department of Consumer Affairs. This department investigated the situgtiop, and advised plaintiff on April 12, 1972, that Mr. Hayes had advised the department that ‘ ‘ a new sofa was being made up for her and would be ready late in May 1972.”
Disgusted with what appeared to be a run around from the defendant, plaintiff took out a summons in this court and subsequently obtained a default judgment on June 7, 1972 for *574 $613.75, including costs and disbursements against the defendant, for the return of the money she had paid and advanced. .This default was vacated by Judge Kassoff on October 26,1972, and the matter then came on for trial before me on March 12, 1973.
Once this suit was started, defendant made several attempts, through its principáis and attorneys, offering to settle this matter, and, in fact, made an appointment for plaintiff and her decorator to go to its factory in Lodi, New Jersey, to inspect the allegedly refinished sofa. On February 2, 1973, after the plaintiff and her decorator journeyed at some inconvenience, expense and loss of work from New York City to Lodi, they were told at the factory by a Miss Terry, another of defendant’s employees, that a Mr. Gosberg, one of defendant’s owners, was the only one in the whole organization who knew where the sofa was stored by the factory, and that he was then unfortunately out of tow. Plaintiff testified that she made the Lodi appointment with Mr. Gosberg on the day before, and that it was confirmed the day of the appointment, and she was not advised that Mr.. Gosberg would not be present. Thus, they made a fruitless and empty-handed trip at a cost of their personal and work time, and at their expense.
Defendant constantly claimed during the trial that the reason for plaintiff’s refusal of delivery was that she said it was not a Chesterfield piece even though she ordered a ‘ ‘ BEA ’ ’ style piece. Plaintiff testified that the sofa bed delivered to her apartment on February 26, 1972, looked like the Chesterfield model with one cushion and not six, but that it was poorly made. Plaintiff and her decorator are positive in their testimony that they did not order a “ BEA” style sofa, and only ordered á Chesterfield sofa based upon defendant’s New York Times advertisement (shown to the court), picturing only the Chesterfield style sofa bed. This advertisement triggered the visit to defendant’s showroom since plaintiff and the decorator had decided that this was the item wanted for plaintiff’s apartment. After seeing the Chesterfield in the showroom, plaintiff ordered it as indicated above, but changed the over-all dimensions to fit a particular room in her apartment. This was not a change in style inasmuch as defendant held itself out to be a custom furniture manufacturer to the decorator’s trade. Plaintiff and her decorator said that the reason they came to the showroom was to order a Chesterfield and that is what they ordered unequivocally.
*575 Plaintiff was also told before the abortive February 2, 1973 trip to Lodi by a Mr. Kotick, another of defendant’s employees — go down to the plant and see the sofa, and if it is all right, she could have it for $250 oil ”; and on a subsequent occasion Mr. Kotick told her — “ if you want the sofa, you must take it sight unseen and you can have $250 off.”
The decorator’s testimony corroborates plaintiff’s narrative that delivery time was of the essence of the order; and further that Mr. Gosberg told her on April 19, 1972, that plaintiff “ would have to purchase new leather if she wanted a new sofa; that the sofa as delivered was a mess; that the sofa could not be fixed; that he was not worried about plaintiff’s default judgment; that he has lawyers on retainer; that plaintiff would have to spend time in court and go to the expense of hiring a lawyer; and that he was going to harass plaintiff.” Plaintiff testified that Mr. Gosberg told her the same thing.
In rebuttal, defendant only called Mr. Bendinelli to the witness stand. The court as the trier of the facts, in view of all the circumstances, does not find his testimony, as án employee of the defendant, credible. He did not controvert the “ time-is-of-the essence ” testimony of plaintiff and her decorator. He did not see the sofa bed at or about the time of the delivery to defendant’s apartment. He did not qualify as an expert in the preparation and manufacture of custom-built furniture. He knew nothing of the Di Máteo, Gosberg, Kotick or Terry conversations with plaintiff as testified to by her.' The court draws inferences unfavorable to defendant’s position by virtue of the fact that defendant did not choose to bring in and place on the stand, Messrs. Gosberg, Kotick, Di Mateo or Miss Terry, or the delivery truckmen, to testify or controvert plaintiff’s testimony, nor did defendant offer any reasonable explanation as to why they were unavailable to testify.
The court finds that plaintiff has sustained her burden of proof by a fair preponderance of the credible evidence. The court also finds defendant’s attitude.,, stance and actions herein including first defaulting in this action at the time of the first trial; bringing plaintiff and her decorator on a wild goose chase to Lodi on February 2, 1973 (a callous and insensitive act); failing to deliver the sofa bed timely on at least four promised occasions; allowing a history of procrastination to develop in delivering a properly crafted custom-built sofa bed ; taunting the plaintiff with the spectre of attorney’s and court expenses and harassment as all being totally unconscionable and an example of the worst in ethical behavior by a com *576 mercial 'business to one of its customers, to whom it owed, at the very least, candor and honesty in its dealings. The circumstances all spell out an atmosphere of disregard and insensitivity to plaintiff’s right as a customer for fair dealing, prompt service, and good craftsmanship. Apparently, the defendant’s idea of good business is customer harassment and an attitude of arrogance as a purveyor of goods to one lured to its premises by a pretty advertisement. This court will not countenance attitudes of “ customer be damned ” or “let the customer beware.”
Judgment, accordingly, for the plaintiff for $558.35, with interest from November 16, 1971, plus the costs and disbursements of this proceeding. Defendant’s counterclaim as cop* tained in its amended answer is dismissed.